Lee S. Harris (SBN 076699)
Michael W. Flynn (SBN 247501)
GOLDSTEIN, GELLMAN, MELBOSTAD,
GIBSON & HARRIS, LLP
1388 Sutter Street, Suite 1000
San Francisco, CA 94109-5494
Tel.: (415) 673-5600
Fax: (415) 673-5606

Attorneys for Plaintiff
Louis J. Vela

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Louis J. Vela,<br><br>Plaintiff,<br><br>v.<br><br>AT&T Umbrella Benefit Plan No. 1.<br><br>Defendant. | Case No. CV 08-1575-BZ<br><br>**FIRST AMENDED COMPLAINT FOR:**<br><br>1) **RECOVERY OF ERISA PLAN BENEFITS [29 U.S.C. § 1132(a)(1)(B)]** |

For his complaint, Plaintiff Louis J. Vela alleges as follows:

**JURISDICTION**

1. This court has jurisdiction over this action, under 28 U.S.C. § 1331 (federal question) and 29 U.S.C. § 1132(e)(1) (ERISA), irrespective of the amount in controversy or the citizenship of the parties.

**VENUE**

2. Venue is proper because the Northern District of California is the federal district in which the Plan was administered and where the breach occurred. 29 U.S.C. § 1132(e)(2).

///

///

///

**RELEVANT ENTITIES**

3. Plaintiff Louis Vela is, and at all relevant times herein was, an individual residing in Sacramento County, California.

4. SBC Disability Income Plan, Dated March, 1999, (the "Plan") was the plan under which plaintiff was eligible for Long Term Disability ("LTD") benefits. (A true and correct copy of the Plan Description is attached hereto as Exhibit "A.")

5. The SBC Medical Absence and Accommodations Resource Team, (SMAART), as administered by Sedgwick Claims Management Services, Inc., administered the Plan at plaintiff's place of work at SBC.

6. AT&T and SBC merged, and AT&T now controls the SBC Plan at issue. AT&T Integrated Disability Service Center, as administered by Sedgwick Claims Management Services, Inc., currently administers the Plan.

7. AT&T UMBRELLA BENEFIT PLAN NO. 1 is the proper party in this case because it assumed all rights and responsibilities for the Plan when the various entities listed above merged.

8. Plaintiff is informed and believes, and thereon alleges, each defendant named herein acted in concert and participated in the acts and omissions alleged herein, and that each defendant was acting with the consent of the other defendants within the scope of their authority as an agent, employee, servant, partner, joint-venturer, or other representative, and was jointly responsible with each other defendant for such acts and omissions.

9. Plaintiff is ignorant of the true names and capacities of Defendants herein sued as DOES 1-100, and therefore sues these Defendants by such fictitious names. Plaintiff will amend this complaint to allege their true names and capacities when ascertained.

FACTS

10. On June 21, 2000, Mr. Vela began working for SBC as a Network Sales Specialist.

11. In June 2001, SBC promoted Mr. Vela to Sales Manager.

12. In 2002, Mr. Vela was diagnosed with Bipolar Disorder, major depression with anxiety, Attention Deficit Hyperactivity Disorder, and panic attacks.

13. On June 6, 2002, Mr. Vela stopped working.

14. On July 15, 2002, SBC approved short-term disability benefits for Mr. Vela.

15. Mr. Vela remained on short-term disability until April, 2003.

16. On May 1, 2003, Mr. Vela returned to work, but relapsed and stopped working on June 18, 2003.

17. Mr. Vela applied for long-term disability ("LTD") benefits.

18. On October 10, 2003, SBC denied LTD benefits

19. Wishing to return to work, Mr. Vela met with Dr. Bruce Wenokur, who recommended that Mr. Vela could return to work as an account executive (a non-management position).

20. SBC offered Mr. Vela a position as an account executive, which Mr. Vela accepted.

21. On November 19, 2003, Mr. Vela returned to work as an account executive.

22. However, Mr. Vela was unable to perform as an account executive due to his disability.

23. On January 8, 2004, Mr. Vela stopped working due to his disability, and SBC placed him on administrative leave.

24. On January 9, 2004, Mr. Vela underwent a Fitness for Duty evaluation.

25. The SBC examining physician concluded that Mr. Vela was unfit to return to work.

26. On March 16, 2004, SBC approved LTD benefits for Mr. Vela.

27. The same day Mr. Vela was approved, Monet Vela, Mr. Vela's wife, asked about

possibilities for Mr. Vela to return to work. She explained that Mr. Vela's hope and plan was to return to work as quickly as medically possible.

28. The Plan defines total disability as being "prevented by illness or injury from engaging in any employment for which you are qualified or may reasonably become qualified for based on education, training or experience.

You will be considered totally disabled if you are incapable of performing the requirements of a job other than one for which the rate of pay is less than 50% of your basic wage rate at the time your long-term disability started.

However, you are allowed to work and still receive your LTD benefits if the job pays less than 50% of your basic wage rate before your disability started. But, the benefits payable when added to the pay you receive for working cannot exceed 75% of your basic wage rate at the time your long-term disability started."

29. The Plan provided for LTD benefits equal to the sum of 60% of Mr. Vela's monthly salary at the time of his disability. At the time, Mr. Vela's monthly salary was $7,702.58. SBC calculated Mr. Vela's benefit to be $4,621.55/month.

30. LTD benefits were to continue until Mr. Vela's 65th birthday as long as he was disabled and under a doctor's care.

**Medical information received by SBC**

31. From March, 2004 to September, 2006, SBC maintained an open file on Mr. Vela's disability, and received voluminous medical documentation. During this time, Mr. Vela received psychiatric treatment from Dr. Martin Rogers about every 2 weeks, and Dr. Bruce Wenokur about every 3-4 weeks.

32. On August 23, 2004, SBC recorded a progress report from Dr. Rogers. (See Ex. ____ at p. 132.) The report listed symptoms consistent with his earlier reports, including memory problems,

distractability, anxiety, and depressed mood.

33. On August 23, 2004, SBC recorded a progress report from Dr. Wenokur. (See Ex. ___ at p. 131.) The report indicated continuing symptoms including "Problems with concentration and focus. . ."

34. On February 10, 2005, SBC recorded progress reports from Drs. Wenokur and Rogers. (See Ex. ___ at pp. 105-106.) These reports indicated continuing symptoms, including severe mood swings and accompanying "very bad" concentration, as well as periods of up to four days during which Mr. Vela was unable to get out of bed.

35. On March 3, 2005, SBC recorded a progress report from Dr. Rogers. (See Ex. ___ at pp. 103-104.) This report indicated continuing symptoms including memory problems, difficulty finishing tasks, and periods of up to 3 days during which Mr. Vela was unable to get out of bed.

36. On February 10, 2005, SBC determined that Mr. Vela was still unable to return to work, and that his medical progress reports supported no improvement. (See Ex. ___ at p. 104.)

37. On December 7, 2005, SBC recorded a progress report from Dr. Rogers. (See Ex. ___ at pp. 76-77.) This report indicated continuing symptoms including profound depression during which Mr. Vela was unable to get out of bed for several days, distractability, and difficulty completing tasks. Dr. Rogers indicated that Mr. Vela was unfit to return to work.

38. On December 29, SBC recorded a progress report from Dr. Wenokur. (See Ex. ___ at pp. 70-71.) This report indicated that Mr. Vela was permanently disabled and presented an ongoing potential for aggression or harm to fellow employees. Dr. Wenokur indicated that Mr. Vela was not able to return to work.

39. On January 18, 2006, SBC recorded chart notes it had previously requested from Dr. Wenokur for the period from February 11, 2005 to December 21, 2005. (See Ex. ___ at pp. 65-68.) These notes indicated manic-depressive behavior with various degrees of severity.

40. On October 12, 2006, SBC recorded notes from Dr. Wenokur. (See Ex. ___ at pp. 31-34; 35-36.) Those notes indicated varying symptoms including severe aggression (including a fistfight with a neighbor), obsessive thinking, and some improvement in mood. Notes indicated that Mr. Vela had returned to some work at Home Depot. Notes reported from Dr. Rogers recorded at the same time indicated continued anger control problems, severe concentration problems and distractability. Dr. Rogers indicated that Mr. Vela had begun working, which resulted in an exacerbation of his symptoms. With regard to the number of hours worked, Dr. Rogers noted "*His anxiety has increased as he doubts his performance and his abilities; his desire to please resulted in his increase his hours despite recommendations from Dr. Wenokur and myself that he limit his hours*; his irritability has increased and is directed toward other employees and demanding customers ..." (See Ex. ___ at p. 36 [emphasis added].)

**Communications with SBC regarding returning to work, and LTD benefit payment.**

41. On March 16, 2004, the same day Mr. Vela was approved for LTD benefits, Mrs. Vela's asked about possibilities for Mr. Vela to return to work. She explained that Mr. Vela's hope and plan was to return to work as quickly as medically possible.

42. On October 7, 2004, Mr. Vela discussed with SBC the possibility of working part-time in a position that did not cause stress in order to re-establish a work history on a small scale. (See Ex. ____ at p. 127.) SBC advised Mr. Vela that he was allowed to work and receive benefits, but that SBC would look at overall capacity to earn.

43. On October 20, 2004, SBC spoke to Mr. Vela, and asked about working. (See Ex. ___ at p. 125.) Mr. Vela indicated that he had stopped searching for work because SBC had made it seem that working would jeopardize his benefits. SBC apologized for discouraging Mr. Vela from looking for work. SBC "want[ed] to make it clear that the definition of disability is based upon what he medically can/cannot do and can/cannot earn. So if has the capacity to earn, even if he is not currently

earning, we will look at that in terms of whether or not he meets the definition of disability."

44. On November 18, 2004, SBC adjusted Mr. Vela's LTD benefits based on new information from a supervisor regarding base pay. (See Ex ___ at p. 118.) SBC calculated Mr. Vela's monthly gross payment to be $4,621.55/month. Subtracting SSDI benefits of $3,154.67, SBC calculated Mr. Vela's net benefits to be $1,466.88/month. This resulted in an overpayment, which Mr. Vela repaid to SBC by means of having the overpayment withheld from a later LTD payment check. (See Ex. ___ at. P. 108.)

45. In May, 2005, SBC discovered another overpayment due to SSDI benefits.

46. On January 18, 2005, Mrs. Vela spoke to SBC regarding the overpayment, and discussed that Mr. Vela had changed doctors and wished to know whether such a switch would jeopardize LTD benefits. (See Ex ___ at p. 109.) SBC indicated that it does not "have a policy regarding timeframes of warnings."

47. On September 22, 2006, Mrs. Vela left a message with SBC to determine exactly how much Mr. Vela was entitled to earn and still remain on LTD.

48. On September 25, 2006, SBC returned Mrs. Vela's call, indicating that it would have to look into the matter and would get back to Mrs. Vela.

49. On October 4, 2006, SBC called Mrs. Vela. During this conversation, SBC informed Mrs. Vela that the benefits payable when added to the pay he received for working could not exceed 75% of his basic wage rate at the time his LTD started. 75% of Mr. Vela's basic wage rate at the time his LTD started was $5,723.81/month. Mr. Vela's LTD benefits were $4,579.05/month. So, Mr. Vela could not earn more than $1,144.76/month. During this conversation, Mrs. Vela indicated that she was trying to cover her bases to ensure that Mr. Vela's benefits would continue, and that Mr. Vela's return to work was only a short-term trial run to determine whether he could return to work. SBC indicated that it would monitor Mr. Vela, and if he *continued* to earn more than $1,144.76/month, it

would reconsider LTD benefits.

**Mr. Vela's failed attempted to return to work at Home Depot**

50. Mr. Vela's consistent goal throughout his disability was to return to work. In September, 2006, Mr. Vela began to feel temporarily better, and wished to test himself in a working environment.

51. On September 5, 2006, Mr. Vela began working in the plumbing department of Home Depot. His basic wage rate was $11.50. (See Ex ___ [Home depot pay stubs].)

52. From September 5, 2006 to September 10, 2006, Mr. Vela worked 38 hours and earned a gross pay of $437.00, and a net pay of $400.07.

53. From September 11, 2006 to September 24, 2006, Mr. Vela worked 72.75 hours and earned a gross pay of $842.38, and a net pay of $771.20.

54. From September 25, 2006 to October 8, 2006, Mr. Vela worked 80.75 hours and earned a gross pay of $937.25, and a net pay of $858.08.

55. The pay stubs for the period from September 25, 2006 to October 8, 2006 do not specify how much Mr. Vela earned during the month of September. That is, the pay stubs do not indicate which days in this pay period landed in September, as opposed to October.

56. However, Mr. Vela was unable to continue working due to his Bipolar Disorder, major depression with anxiety, Attention Deficit Hyperactivity Disorder, and panic attacks. Mr. Vela experienced problems interacting with customers and fellow employees. Five weeks after his trial run to re-enter the workforce in this limited-responsibility position, Mr. Vela had to stop.

**SBC's improper LTD benefits denial and Mr. Vela's administrative appeal**

57. On November 16, 2006, SBC denied LTD benefits to Mr. Vela. (See Ex. ____[Denial Letter].) SB offered two rationales for its denial. First, SBC indicated that "the hours worked for the month of September provided you with earnings substantially in excess of $1,144.76" and Mr. Vela

was thus ineligible to receive LTC benefits. Second, SBC indicated that there "In addition, the updated medical information received from Dr. Bruce Wenokur and Dr. Martin Rogers was reviewed by a Physician Advisor specializing in Psychiatry. The Physician Advisor observed that these records did not provide any observable evidence demonstrating limitation of functioning. There is insufficient medical evidence to objectively support a global impairment precluding your ability to function in the workplace, or the ongoing need for restrictions of work hours. This would be evidence in that you have been working in excess of 20 hours since the date of your initial employment, and yet you *continue* sustaining full-time employment." (See Ex. ______ at p._____.)

58. On February 20, 2007, Mr. Vela appealed. (See Ex. ___[Appeal Letter].) Mr. Vela noted in his appeal letter that SBC had indicated to him that he would have to continue to earn in excess of 1,144.76 to suffer any adverse benefit decision. Mr. Vela pointed out that he had only returned to work for 5 weeks, that his trial to return was unsuccessful, and that he was no longer working as a result of his continuing disability. Mr. Vela further pointed out that his medical condition had not changed.

59. On April 12, 2007, SBC denied Mr. Vela's appeal. (See Ex _____[Appeal Denial Letter].) SBC indicated that its independent physician advisor, Dr. Robert Polsky, observed that "during the timeframe in question you are not documented to be suicidal, parasuicidal, homicidal, manic, psychotic, or impaired in performing activities of daily living. He observed that absent are findings of mental status examinations that would indicate problems with memory, cognition of concentration. He stated that the determination of his review is that he available clinical documentation does not indicate that you are disabled from performing any job from November 1, 2006 to the present." SBC reiterated that Mr. Vela had earned in excess of $1,144.76 in September 2006.

**FIRST CAUSE OF ACTION**

(Recovery of ERISA Plan Benefits)

60. Plaintiff realleges and incorporates by reference herein the allegations contained in paragraphs 1 through 32, above.

61. The Plan is an employee benefit plan covered by ERISA. 29 U.S.C. §§ 1001-1461.

62. Mr. Vela was a covered participant in or beneficiary of the Plan at the time of her disability.

63. Mr. Vela performed his obligations under the Plan.

64. Defendants refusal and failure to pay monthly LTD benefits is improper and in violation of the terms of the plan.

65. Defendants' failure to perform under the Plan was not justified or excused.

66. The claims and appeals procedures provided under the Plan have been exhausted.

67. SBC improperly denied benefits due to Mr. Vela's return to work. Mr. Vela had consistently communicated a desire to return to work, and obtained employment with Home Depot simply as a test. He worked at Home Depot for only 5 weeks. Indeed, he worked the hours he did in express contradiction to his two doctors' recommendations because his bipolar disorder caused him to feel an irrational need to please others. His bipolar disorder and anxiety disorder caused him to work hours that resulted in paychecks in slight excess of his maximum allowance under the Plan. His disability caused him to work more than he was supposed to, and he quit promptly when it became apparent that he was not fit to return to any sort of work.

68. As a reward for taking these test steps in hopes to eventually return to work with SBC, SBC cut Mr. Vela's benefits after a 5-week stint with Home Depot. Mr. Vela relied upon the statements by SBC that it would track Mr. Vela if he "continued" to earn in excess of the Plan allowance. Mr. Vela worked for 5 weeks. This short period of time cannot be fairly categorized as a

"continued" basis, especially given that it was Mr. Vela's disability that caused him to work the excessive hours in the first place. This short period of time was not sufficient to support cutting Mr. Vela's benefits based on the policy language.

69. Further, with regard to the medical evidence, SBC simply chose to believe its own physician, and ignored the consistent reports from Drs. Wenokur and Rogers that Mr. Vela suffered from disability and was unfit to work. These doctors consistently reported problems with concentration, distractibility, and memory problems. SBC's treating physician simply ignored these reports when he opined that there was insufficient medical evidence to support a finding of global impairment. A Plan fiduciary must consider all evidence before it, and not simply rely upon evidence that supports a claim denial.

**PRAYER**

WHEREFORE, plaintiff prays for judgment as follows:

1. Damages in an amount to be determined at trial, and no less than $2,000,000.00;

2. Interest, attorney fees, and costs, under 29 U.S.C. § 1132(g)(1);

3. Such other and further relief as the court may deem just and proper.

Dated: May 14, 2008.

**GOLDSTEIN, GELLMAN, MELBOSTAD, GIBSON & HARRIS, LLP**

/s/
Lee S. Harris
Michael W. Flynn
Attorneys for Plaintiff
Louis J. Vela

**EXHIBIT  A**

**DISABILITY TABLE OF CONTENTS**

Overview....DI 1
Eligibility....DI 1
Enrollment And Effective Dates....DI 2
Contributions....DI 2
Short-Term Disability (STD) Benefits....DI 2
Long-Term Disability (LTD) Benefits....DI 5
Exclusions....DI 6
Social Security Benefits....DI 7
How To File A Disability Claim....DI 7
Vocational Rehabilitation....DI 7
When Coverage Ends....DI 8
Other Plan Information....DI 8
Plan Name....DI 9
Type Of Plan Administration....DI 9
Plan Type....DI 9
Plan Sponsor And Plan Administrator....DI 9
Plan Funding....DI 9
Plan Identification....DI 9
Service Of Legal Process....DI 10
Plan Records....DI 10
Limitations On Rights....DI 10
Assignment And Non-Alienation....DI 10
Claim And Appeal Process....DI 10
ERISA Rights Of Participants And Beneficiaries....DI 11
Common Terms....DI 13
Company Exceptions....DI 14

**Nonbargained Employees of:** AMI, DGA, HC, MSI, MSI-USA, NB, PB, PBD, PBEX, PBL, PBIS, PBMS; PTEPS, PTF, PTSS, SBA, SBC-IA, SBC-OPS, SBCI, SBCI-MSI, SBCTRI, SBIS, SBLD, SBMS, SBMS-CC, SBMS-WLP, SBT, SBVS, SBYP, SMSI, SWBAG, SWBT, SWBW, WDPS
**Bargained-for Employees of:** SBC-OPS, SBYP, SMSI, SWBT

**Date Issued:** 3/99

33

**OVERVIEW**

The Plan details in this Summary Plan Description are generally applicable for all SBC companies. However, differences may exist from company to company and among groups of employees. These differences are indicated using shaded text. Please refer to the charts on page DI 14 – DI 20 for information regarding differences that may apply to you.

Being financially prepared so you can adequately provide for you and your family during a disability is crucial. Each regular, term or temporary employee, full- or part-time, is eligible for short-term disability benefits on his/her first day of employment under the SBC Disability Income Plan ("Plan"). Each regular employee is also eligible for long-term disability benefits under the Plan. The Plan's benefits are provided at no cost to the employee and are borne by the employee's Participating Company. Not all SBC companies offer the SBC Disability Income Plan and some do not offer the Plan to all employees. Please refer to the charts on page DI 14 for more information.

Under the Plan:

- You may receive short-term disability (STD) benefits for up to 52 weeks beginning on the eighth consecutive calendar day of an absence caused by an illness or injury. You may receive a STD benefit of 100% of pay minus payments made to you under law for a specific number of weeks based on your Net Credited Service. Payments under law may include Workers' Compensation, Social Security Disability Insurance Benefits, and/or any other disability benefits.
- You may receive a benefit of 60% of pay minus payments made to you under law for the balance of the 52 weeks, so long as you remain disabled.
- If you are totally disabled due to an illness or injury after expiration of 52 weeks of STD benefits, you may be eligible to receive long-term disability (LTD) benefits of 60% of pay until you are no longer totally disabled, or up to at least age 65.

Shaded areas indicate there are differences between Participating Companies/groups of employees. Please see the charts on DI 14 – DI 20.

SBC has selected Claims Administrators to administer the SBC Disability Income Plan. Each Claims Administrator is either a company retained by SBC, that functions on a contract administration basis, or a departmental organization designated by SBC. Claims Administrators are responsible for the day-to-day management of the Plan, including determining one's eligibility for the Plan and the granting and denying of claims for benefits. Your Claims Administrator for determining whether you are eligible at all for benefits under a particular portion of the Plan may be different from the Claims Administrator that determines whether you are disabled from a medical standpoint.

This summary plan description (SPD) is a description of the Disability Income Plan and is part of the official Plan text. It doesn't cover all details. Additional details are included in other portions of the official Plan text. The official Plan text legally governs the operation of this Plan and is the final authority on the terms of the Plan.

SBC Communications Inc. (SBC) intends to continue this Plan indefinitely but reserves the right to end or amend this Plan at any time and for any reason.

**ELIGIBILITY**

Each regular, term or temporary employee, full- or part-time, is eligible for short-term disability benefits on his/her first day of employment under the Plan. Each regular employee is also eligible for long-term disability benefits under the Plan.

Nonbargained Employees of: AMI, DGA, HC, MSI, MSI-USA, NB, PB, PBD, PBEX, PBI, PBIS, PBMS, PTEPS, PTF, PTSS, SBA, SBC-IA, SBC-OPS, SBCI, SBCI-MSI, SBCTRI, SBIS, SBLD, SBMS, SBMS-CC, SBMS-WLP, SBT, SBVS, SBYP, SMSI, SWBAG, SWBT, SWBW, WDPS
Bargained-for Employees of: SBC-OPS, SBYP, SMSI, SWBT

DI 1

Date Issued: 3/99

34

**ENROLLMENT AND EFFECTIVE DATES**

There is nothing you need to do to enroll in the Disability Income Plan. You automatically participate in the Plan on your first day of employment.

**CONTRIBUTIONS**

The cost of the Disability Income Plan is paid entirely by your Participating Company.

**SHORT-TERM DISABILITY (STD) BENEFITS**

**Shaded areas indicate there are differences between Participating Companies/groups of employees. Please see the charts on DI 14 – DI 20.**

**Net Credited Service means a period of employment in any SBC company as determined by the employee's Participating Company.**

**Your total STD benefit is 100% of your basic wage rate, or 60% of your basic wage rate, minus the sum of any amounts from Workers' Compensation, primary Social Security and any other governmental disability benefit payments.**

You are eligible to receive STD benefits beginning on the eighth consecutive calendar day of an absence caused by an injury or illness. This means that to receive STD benefits, you must complete a seven-day waiting period of total and/or partial absence due to a disability. Benefits may be withheld, discontinued or excluded under the Plan. See *Exclusions* on page DI 6.

Any combination of whole day or partial day absences during seven consecutive days fulfills the waiting period requirement. Partial day absence must be at least one-half of the scheduled workday. If the seven-day waiting period is interrupted by a full "return to work" day, a new seven-day waiting period must be completed before plan benefits commence.

*Total disability* for STD benefits means that due to an illness or injury you are unable to perform all of the essential functions of your job or another available job assigned by your company with the same full- or part-time classification for which you are qualified. This means you are unable to perform any work for your company. As long as you remain disabled based on this definition, you may receive STD benefits up to a maximum of 52 weeks. However, if you can do some part of your job or some part of another available job for some part of the time, you are not considered totally disabled and may be eligible for partial disability benefits.

The amount of your STD benefits is based on your Net Credited Service as of the first day of STD benefits as shown in the following chart:

| NET CREDITED SERVICE | WEEKS AT 100% PAY | WEEKS AT 60% PAY |
|---|---|---|
| 0 but less than 2 yrs. | 4 | 48 |
| 2 but less than 5 yrs. | 8 | 44 |
| 5 but less than 15 yrs. | 13 | 39 |
| 15 but less than 20 yrs. | 26 | 26 |
| 20 but less than 25 yrs. | 39 | 13 |
| 25 or more yrs. | 52 | 0 |

*Pay* for determining short-term disability benefits is your basic wage rate as of the first day of your short-term disability absence including any night differential, but excluding any overtime. No wage increase or other changes in this basic wage rate will be effective until you return to work on a part-time or full-time basis.

2C

SHORT-TERM DISABILITY (STD) BENEFITS (continued)

Shaded areas indicate there are differences between Participating Companies/groups of employees. Please see the charts on DI 14 – DI 20.

**Partial Disability**

You also may be eligible for STD benefits if you have a partial disability. However, you must complete the seven-day waiting period of absence before partial disability benefits are payable.

*Partial disability* means that due to an illness or injury you are unable to perform all of the essential functions of your job...or another available job assigned by your company within the same full- or part-time classification for which you are qualified...for the same number of hours that you were regularly scheduled to work before your disability.

You will be paid for the days or partial days you work and receive STD benefits for the days or partial days you do not work, as fully scheduled prior to your disability. You will receive 100% or 60% STD benefit (minus any other sources of disability income) based on your years of Net Credited Service as shown in the previous chart. No STD benefit will be paid if you don't return to work when you are partially disabled. The time you are partially disabled and work a partial schedule will count as full weeks against your maximum disability period.

If you receive both total and partial STD benefits during the same disability period, the number of weeks you can receive partial disability benefits at 100% or 60% of pay will be reduced by the number of weeks that you receive total disability benefits. *Under no circumstances can you receive more than 52 weeks of STD benefits when total and partial disability periods are combined.*

**Payment Of STD Benefits**

Ordinarily, you receive your STD benefits at the same time as you would have received your pay if you were still working. Your checks will be sent to your work location. However, SBC may, at its discretion, direct that benefits for continued disability be paid monthly. The SBC Rules for Beneficiary Designations apply to any unpaid STD benefits due to you at the time of your death.

This Plan will pay only the amount in excess of payments under law for a disability, such as:

- Workers' Compensation;
- State disability;
- Veteran's benefits; or
- Any amount received from any third party.

STD benefits may be withheld if an overpayment would result due to receipt of payment under law for the same disability, including amounts received from any third party. However, payments from this Plan will not be reduced because of any benefits paid due to military service.

**Part-Time Employees**

If you work part-time, you are eligible to receive 100% of pay or 60% of pay based on your basic wage rate and number of hours of work scheduled per week (not including overtime). If you were an active employee as of December 31, 1980, and worked part-time on or after January 1, 1981, during the same continuous period of employment, STD benefits are based on your basic wage rate applied *as if you were a full-time employee.* The periods of 100% or 60% of pay depend on your Net Credited Service as of the first day of absence.

Nonbargained Employees of: AMI, DGA, HC, MSI, MSI-USA, NB, PB, PBD, PBEX, PBI, PBIS, PBMS, PTEPS, PTF, PTSS, SBA, SBC-IA, SBC-OPS, SBCI, SBCI-MSI, SBCTRI, SBIS, SBLD, SBMS, SBMS-CC, SBMS-WLP, SBT, SBVS, SBYP, SMSI, SWBAG, SWBT, SWBW, WDPS
Bargained-for Employees of: SBC-OPS, SBYP, SMSI, SWBT

DI 3

Date Issued: 3/99

36

**SHORT-TERM DISABILITY (STD) BENEFITS (continued)**

Shaded areas indicate there are differences between Participating Companies/groups of employees. Please see the charts on page DI 14 – DI 20.

#### If You Become Disabled Again

If you recover from your short-term disability and return to work and become disabled again, your STD benefits will be paid as shown in the chart below:

| IF... | THEN... |
|---|---|
| You recover from your short-term disability and return to work on your regular schedule for two weeks (14 calendar days) or less and become disabled again... | Your STD benefits will begin immediately. |
| You recover and return to work on your regular schedule for more than two weeks but less than 26 full weeks and become disabled again... | Your STD benefits will begin on the eighth consecutive day of your new absence. In both of the cases above, the previous absence will be included in calculating the number of weeks you will receive 100% of pay and 60% of pay. *Under no circumstances can you receive more than 52 weeks of STD benefits when any previous and current STD disability periods are combined.* |
| You recover and return to work full-time for 26 full weeks or more and become disabled again... | Your STD benefits will begin on the eighth consecutive day of your new absence. Any benefits previously received are not counted in determining the new 100% or 60% of pay period to which you are entitled or in determining the maximum period that you can receive STD benefits. |

#### Employment After Expiration Of STD Benefits

An individual covered under the Plan will, after the expiration of STD benefits, be considered a former employee unless on a disability leave of absence. Following expiration of STD benefits, reinstatement within one year to an available company job you are qualified to perform, will be provided if medical evidence is submitted to substantiate that you are able to return to work. This one-year period during which you may be reinstated includes any period of disability leave of absence. Immediate bridging of service will be granted upon return to work.

After STD benefits expire (52 weeks), if you return to work immediately or are reinstated during the one-year period and if you become disabled within 26 weeks of return or reinstatement, you are not eligible for STD benefits. However, you may be

Nonbargained Employees of: AML, DGA, IIC, MSI, MSI-USA, NB, PB, PBD, PBEX, PBI, PBIS, PBMS, PTEPS, PTF, PTSS, SBA, SBC-IA, SBC-OPS, SBCI, SBCI-MSI, SBCTRI, SBIS, SBLD, SBMS, SBMS-CC, SBMS-WLP, SBT, SBVS, SBYP, SMSI, SWBAG, SWBT, SWBW, WDPS
Bargained-for Employees of: SBC-OPS, SBYP, SMSI, SWBT

DI 4

Date Issued: 3/99

37

**SHORT-TERM DISABILITY (STD) BENEFITS (continued)**

immediately eligible for LTD benefits and/or a Service or Disability Pension, if applicable. See the summary plan description for the SBC Pension Benefit Plan.

**LONG-TERM DISABILITY (LTD) BENEFITS**

LTD benefits may begin if you are totally disabled as defined below after 52 weeks of STD benefits. Your monthly LTD benefit is 60% of your monthly pay minus any other sources of disability income. *Pay* for LTD benefits means your basic wage rate determined as if you were actively at work on the day immediately before the start of your LTD benefits.

*Total disability* for a long-term disability means that you are prevented by illness or injury from engaging in any employment for which you are qualified or may reasonably become qualified for based on education, training or experience.

You will be considered totally disabled if you are incapable of performing the requirements of a job other than one for which the rate of pay is less than 50% of your basic wage rate at the time your long-term disability started.

However, you are allowed to work and still receive your LTD benefits if the job pays less than 50% of your basic wage rate before your disability started. But the benefits payable when added to the pay you receive for working cannot exceed 75% of your basic wage rate at the time your long-term disability started. LTD benefits continue for as long as you are totally disabled up to age 65; however, benefits may be paid for a maximum period of four years if your age was 61 or older when STD benefits began.

Other income sources may include disability pension, Workers' Compensation, Social Security Disability Insurance Benefits, or other governmental disability benefits.

**Benefits From Other Sources**

The Plan provides you with an LTD benefit of 60% of your basic wage rate reduced by benefits you may receive from other sources of disability income, such as:

- Workers' Compensation or similar disability benefits;
- Primary Social Security disability insurance benefits or old-age Social Security benefits when they first become payable;
- Other federal or state disability benefit plans but not including Veteran's benefits; and
- Any STD benefits or pension benefits you may receive from any SBC company pension plan or predecessor plans as well as any overpayment of STD benefit payments.

Shaded areas indicate there are differences between Participating Companies/groups of employees. Please see the charts on DI 14 – DI 20.

Once the amounts of your Social Security benefit and your pension benefit are determined, they remain constant for LTD benefit purposes. Any later increases in your Social Security benefit or pension benefit will not decrease your LTD benefit payments. If you are eligible and apply for pension benefits (including a Disability Pension, if applicable), your pension benefit, to the extent paid to you, will be subtracted from your LTD payments. (If you elect a cashout, the equivalent monthly amount will be calculated and used as the factor for integration with LTD payments.) If you are eligible but elect to defer applying for any applicable pension benefit, your LTD payments will not be reduced by any pension benefits you are entitled to until such time as you apply for and are actually paid the pension benefit.

If you are receiving LTD benefits under this Plan, you are considered a former employee except if you are on a disability leave of absence.

Nonbargained Employees of: AMI, DGA, IIC, MSI, MSI-USA, NB, PB, PBD, PBEX, PBI, PBIS, PBMS, PTEPS, PTF, PTSS, SBA, SBC-IA, SBC-OPS, SBCI, SBCI-MSI, SBCTRI, SBIS, SBLD, SBMS, SBMS-CC, SBMS-WLP, SBT, SBVS, SBVP, SMSI, SWBAG, SWBT, SWBW, WDPS
Bargained-for Employees of: SBC-OPS, SBVP, SMSI, SWBT

DI 5

Date Issued: 3/99

38

**LONG-TERM DISABILITY (LTD) BENEFITS (continued)**

**If You Become Disabled Again**

If you recover from your disability, return to work with your company and become disabled again, your LTD benefits may begin:

- Immediately, if you return to work for less than 26 consecutive full weeks before another disability; or
- After another 52-week waiting period, if you return to work for more than 26 consecutive full weeks before another disability.

**Payment Of LTD Benefits**

LTD benefits will be paid to you monthly in arrears. The SBC Rules for Beneficiary Designations apply to any unpaid LTD benefits due to you at the time of your death.

LTD benefits may be withheld if an overpayment of STD or LTD benefits would result due to receipt of payments under law for the same disability including any amount received from any third party.

**EXCLUSIONS**

Shaded areas indicate there are differences between Participating Companies/groups of employees. Please see the charts on DI 14 – DI 20.

STD and/or LTD benefits may be withheld or discontinued under the Plan if:

- You do not submit to a physical examination if requested by your Claims Administrator responsible for determining whether you are disabled from a medical standpoint;
- You are not under the care of a physician while on disability;
- You do not provide proper medical information about your condition;
- You leave home/travel without approval from your Claims Administrator responsible for determining whether you are disabled from a medical standpoint;
- You do not take proper care of yourself and receive proper treatment for your condition;
- You do not follow your Mandatory Vocational Rehabilitation program (if applicable);
- You decline to return to your own job, or another available job assigned by your company, when medically able (STD only) as determined by your Claims Administrator responsible for determining whether you are disabled from a medical standpoint;
- You are entitled to receive any wages paid by an SBC company (except if you are receiving partial STD benefits);
- You take full- or part-time employment with another employer...or work for a self-owned or family-owned business;
- A suit for damages or other legal action is brought by you against SBC or any SBC company because of your injury...except for an action to enforce ERISA rights (see page DI 11);
- A claim for STD benefits is not filed within 60 days from your first day of absence unless the applicable Claims Administrator, at its discretion, determines that the circumstances warrant an extension of the 60 day period. Also, LTD benefits will not be paid if your Claims Administrator requires you to file for LTD benefits and your claim is not filed within 90 days of the expiration of STD benefits;
- Your disability is caused by you committing or attempting to commit a felony or any other crime;
- Your disability is caused by you intentionally self-inflicting injuries;
- Your disability is caused by your service in the military;
- Your disability is caused by war, declared or undeclared...unless on company business, including travel, assignment and relocation outside the United States; or

**EXCLUSIONS (continued)**

- Your disability is caused by your participation in a riot, insurrection, rebellion or civil commotion.

**Overpayments**

If any overpayment is made by the Plan for any reason, the Plan will have the right to recover such overpayment, including by way of deductions from any of your future wages and/or benefits.

**SOCIAL SECURITY BENEFITS**

You may qualify for Social Security disability benefits. Your STD benefits are reduced by any primary Social Security benefits that you may receive. LTD benefits are reduced by any primary Social Security disability benefits you are eligible to receive.

You must apply for Social Security benefits. A Claims Administrator will assist you in filing for Social Security disability income and long-term disability benefits.

If you refuse to apply for Social Security disability insurance benefits, a Claims Administrator may use an estimate of what your monthly Social Security benefit may be for offset purposes. An estimate of your Social Security benefit will be deducted from your LTD payments. An adjustment, if necessary, will be made to your LTD payment to correct for the earlier estimate once the actual Social Security benefit is known. If your Social Security benefits are denied, you will be refunded the amount that was withheld from your monthly LTD payments.

Your Social Security office can provide more information. You will find the phone number and address listed in the telephone book under "United States Government."

Shaded areas indicate there are differences between Participating Companies/groups of employees. Please see the charts on DI 14 – DI 20.

**HOW TO FILE A DISABILITY CLAIM**

To start disability benefits, you must:

- Report your disability to your supervisor immediately;
- Call your Claims Administrator responsible for plan eligibility determinations on the 4th calendar day of absence if you anticipate a disability;
- Contact your physician(s) to make sure he/she cooperates with your Claims Administrator that determines whether you are disabled from a medical standpoint; and
- Upon request, submit to a physical examination by a physician designated by your Claims Administrator that determines whether you are disabled from a medical standpoint.

**VOCATIONAL REHABILITATION**

Under Mandatory Vocational Rehabilitation, a program may be developed to train you for new employment. In that event, Plan approved rehabilitation training program expenses will be paid up to $20,000 by your company.

You will be notified by your Claims Administrator that determines whether you are disabled from a medical standpoint if you have been selected for Mandatory Vocational Rehabilitation and will be advised on how you receive such training. **If you are eligible to receive Vocational Rehabilitation benefits under Workers' Compensation, you will not receive Mandatory Vocational Rehabilitation under this Plan.**

A Mandatory Vocational Rehabilitation training program will be developed by your Claims Administrator, a Vocational Rehabilitation agency or counselor. This training will be tailored to your abilities, skills and interests. You must complete

Nonbargained Employees of: AMI, DGA, HC, MSI, MSI-USA, NB, PB, PBD, PBEX, PBI, PBIS, PBMS, PTEPS, PTF, PTSS, SBA, SBC-IA, SBC-OPS, SBCI, SBCI-MSI, SBCTRI, SBIS, SBLD, SBMS, SBMS-CC, SBMS-WLP, SBT, SBVS, SBYP, SMSI, SWBAG, SWBT, SWBW, WDPS
Bargained-for Employees of: SBC-OPS, SBYP, SMSI, SWBT

DI 7

Date Issued: 3/99

40

**VOCATIONAL REHABILITATION (continued)**

your Mandatory Vocational Rehabilitation program within 24 months from the date you begin in order for program expenses to be covered.

The following types of expenses are covered:

- Vocational Rehabilitation evaluation counseling and job placement services;
- On-the-job training expenses;
- Licenses or certificates;
- Training facility tuition;
- Books and educational supplies;
- Required tools and equipment;
- Certain transportation and relocation expenses;
- Reasonable child care costs if required for participation; and
- Required clothing.

Shaded areas indicate there are differences between Participating Companies/groups of employees. Please see the charts on DI 14 – DI 20.

Some types of expenses not covered are:

- Capital investment for a self-employment rehabilitation plan;
- Capital tool and equipment expenses; and
- Normal commuting expenses.

In addition, any Mandatory Vocational Rehabilitation received under the Plan will be credited against any Vocational Rehabilitation obligation under Workers' Compensation laws.

**WHEN COVERAGE ENDS**

Generally, when you leave the employment of your company, your Disability Income Plan coverage ends. However, in certain cases such as a disability leave of absence, you may be entitled to extended coverage periods for health benefits. To determine the effect of STD and LTD on your health care plans, see the summary plan description applicable to each plan.

**OTHER PLAN INFORMATION**

The following pages describe some additional information about the SBC Disability Income Plan.

The Plan description, as well as the latest Annual Report of the Plan's operations, any applicable bargaining agreements and such other instruments under which the Plan was established or is operated are available for examination by plan participants or beneficiaries.

If the Plan should be terminated or changed...or a Participating Company ends its participation or ceases to provide such benefits...you and other participants may not be eligible to receive benefits as described herein, and you may lose all benefit coverage. However, no Plan termination or change will affect your right to any benefit to which you have already become entitled. Not affecting your right to any short-term or long-term disability benefit to which you have already become entitled means that you would be entitled to continue receiving your disability benefits through the date of the Plan's termination or change.

This does not mean that you or any other participants will acquire a lifetime right to any Plan benefit, or to eligibility for coverage under the Plan, or to the guaranteed continuation of the Plan — merely by reason of the fact that the Plan was in effect during your employment or at the time you received a benefit under the Plan or at any time thereafter.

This summary plan description does not attempt to cover all the details. Additional details are included in other portions of the official Plan text, which regulates the operation of the Plan. The Plan text, of which this SPD is a part,

Nonbargained Employees of: AMI, DGA, HC, MSI, MSI-USA, NB, PB, PBD, PBEX, PBI, PBIS, PBMS, PTEPS, PTF, PTSS, SBA, SBC-IA, SBC-OPS, SBCI, SBCI-MSI, SBCTRI, SBIS, SBLD, SBMS, SBMS-CC, SBMS-WLP, SBT, SBVS, SBYP, SMSI, SWBAG, SWBT, SWBW, WDPS
Bargained-for Employees of: SBC-OPS, SBYP, SMSI, SWBT

DI 8

Date Issued: 3/99

41

**SERVICE OF LEGAL PROCESS**

If you wish to bring a legal action concerning your right to participate in the Plan or your right to receive benefits under the Plan, you must first go through the claim and appeal process described in the *Claim and Appeal Process* section of this summary plan description. A legal action should not be filed until you complete the claim and appeal process. Legal action involving the Plan should be filed directly against the SBC Disability Income Plan. Process in a legal action should be served on the Plan Administrator as Agent for Service of Legal Process for the Plan:

SBC Communications Inc.
c/o Executive Director — Benefit Operations, Room 5-K-10
111 Soledad, Suite 150
San Antonio, TX 78205-2212

**PLAN RECORDS**

All Plan records are kept on a calendar-year basis beginning January 1 and ending December 31 of each year.

**LIMITATIONS ON RIGHTS**

Participation in the Plan does not give you the right to remain employed at any SBC company.

**ASSIGNMENT AND NON-ALIENATION**

Except as otherwise required by law, benefits provided under the Plan may not be assigned or alienated. This means that you may not sell, assign, pledge or otherwise transfer benefits under the Plan before the benefits are distributed to you, nor are your Plan benefits subject to attachment, garnishment, execution or encumbrance of any kind prior to distribution to you.

**CLAIM AND APPEAL PROCESS**

The following will apply when a disability claim has been denied (a claim is a request for a Plan benefit):

The denial of the claim will be sent to you within 90 days of the date the claim was received by the applicable Claims Administrator. In some cases, more than 90 days may be needed to make a decision. In such cases the claimant will be notified in writing, within the initial 90-day period, and an explanation will be provided as to why more time is needed. An additional 90 days may be taken to make the decision if the claimant is provided this notice. The extension notice will show the date by which the decision will be sent.

A claimant may treat his or her claim as denied and appeal a decision if:

- No reply is received by the claimant after 90 days;
- The time for a decision has been extended an additional 90 days and no reply is received after the additional 90 days; or
- Written denial of the claim is received within the proper time limit and the claimant wishes to appeal the written denial.

If a claim for benefits is denied in whole or in part, the claimant may appeal this denial in writing within 60 days after it is received. A review will be conducted on the appeal of the denied claim and a decision will be made within 60 days after receipt of the written request for review. In some cases, more than 60 days will be

Nonbargained Employees of: AMI, DGA, IIC, MSI, MSI-USA, NB, PB, PBD, PBEX, PBI, PBIS, PBMS, PTEPS, PTF, PTSS, SBA, SBC-IA, SBC-OPS, SBCI, SBCI-MSI, SBCTRI, SBIS, SBLD, SBMS, SBMS-CC, SBMS-WLP, SBT, SBVS, SBYP, SMSI, SWBAC, SWBT, SWBW, WDPS
Bargained-for Employees of: SBC-OPS, SBYP, SMSI, SWBT

DI 10

Date Issued: 3/99

02

## COMMON TERMS

Below are certain terms used in this SPD. The official Plan text, of which this SPD is a part, legally governs the operation of the Plan and is the final authority on the meaning of the terms of the Plan.

*Bargained-for Employee*...an employee (other than an individual who is an independent contractor or a leased employee or who is otherwise an employee of another company that is providing services to an SBC company) whose job title and classification are included in a collective bargaining agreement between an SBC company and a union; a confidential employee; an employee whose job title and classification, by agreement between an SBC company and a union, have been excluded from a collective bargaining unit; or a Pacific Telesis company nonbargained, nonconfidential and nonsalaried employee.

*Family Social Security Benefits*...the Social Security benefits your family may receive including benefits for your spouse and/or dependent children as a result of your disability.

*LTD*...long-term disability.

*Nonbargained Employee*...an employee (other than an individual who is an independent contractor or a leased employee or who is otherwise an employee of another company that is providing services to an SBC company) who is not a bargained-for employee as defined above.

*Partial disability*...for STD benefits means that due to an illness or injury, you are unable to perform all of the essential functions of your job...or another available job assigned by your company...for the same number of hours that you were regularly scheduled to work before your disability.

*Participating Company*...an SBC company that has elected to participate in the Plan. A complete list of SBC companies participating in the Plan may be obtained by participants and beneficiaries upon written request to the Plan Administrator and is available for examination by participants and beneficiaries at the Plan Administrator's office.

*Primary Social Security Benefits*...the monthly Social Security amount you may receive because of disability based on your earnings history.

*STD*...short-term disability.

*Total disability*...total disability for STD benefits means that due to an illness or injury you are unable to perform all of the essential functions of your job...or another available job assigned by your company...with the same full- or part-time classification for which you are qualified. Total disability for LTD benefits means that you are prevented by illness or injury from engaging in any employment for which you are qualified or may reasonably become qualified for based on education, training or experience.

**Nonbargained Employees of:** AMI, DGA, HC, MSI, MSI-USA, NB, PB, PBD, PBEX, PBI, PBIS, PBMS, PTEPS, PTF, PTSS, SBA, SBC-IA, SBC-OPS, SBCI, SBCI-MSI, SBCTRI, SBIS, SBLD, SBMS, SBMS-CC, SBMS-WLP, SBT, SBVS, SBYP, SMSI, SWBAG, SWBT, SWBW, WDPS
**Bargained-for Employees of:** SBC-OPS, SBYP, SMSI, SWBT

DI 13

Date Issued: 3/99

46

**COMPANY EXCEPTIONS**

## SBC COMPANIES/GROUPS OF EMPLOYEES TO WHOM THE SBC DISABILITY INCOME PLAN IS NOT OFFERED AS OF MARCH 31, 1999

| COMPANY |
|---|
| PBD Holdings (doing business as Digital Graphics ADvantage) (B) |
| Southwestern Bell Telephone – Competitive Services Unit (B) |
| Southwestern Bell Video Services, Inc. (B) |
| Southwestern Bell Wireless Inc. (B) |
| Worldwide Directory Products Sales, Inc. (B) |
| All Pacific Telesis Group companies' bargained-for employees |
| All Southern New England Telecommunications Corporation (SNET) companies |

*Note: See the chart below for SBC companies/groups to whom the Plan will be offered in 1999.*

## EFFECTIVE DATES OF PARTICIPATION IN THE SBC DISABILITY INCOME PLAN FOR SBC COMPANIES/GROUPS OF EMPLOYEES TO WHOM THE PLAN WILL BE OFFERED IN 1999

| COMPANY | DATE OF PARTICIPATION |
|---|---|
| Nevada Bell (NB) | April 1, 1999 |
| PBD Holdings (doing business as Digital Graphics ADvantage (NB) | July 1, 1999 |
| Pacific Bell (NB) | May 1, 1999 |
| Pacific Bell Directory (NB) | July 1, 1999 |
| Pacific Bell Extras (NB) | July 1, 1999 |
| Pacific Bell Information Services (NB) | July 1, 1999 |
| Pacific Bell Internet Services (NB) | July 1, 1999 |
| Pacific Bell Mobile Services (NB) | July 1, 1999 |
| Pacific Telesis Electronic Publishing Services (NB) | July 1, 1999 |
| Pacific Telesis Group (NB) | July 1, 1999 |
| Pacific Telesis Shared Services (NB) | July 1, 1999 |
| PacTel Finance (NB) | July 1, 1999 |
| SBC Interactive (NB) | July 1, 1999 |
| Southwestern Bell Advertising Group, Inc. (NB) | July 1, 1999 |
| Southwestern Bell Communication Services, Inc. (NB) | July 1, 1999 |
| Southwestern Bell Messaging Services, Inc. (B) | April 1, 1999 |
| Southwestern Bell Video Services, Inc. (NB) | July 1, 1999 |
| Worldwide Directory Products Sales, Inc. (NB) | July 1, 1999 |

NB = Nonbargained employees
B = Bargained-for employees

Nonbargained Employees of: AMI, DGA, HC, MSI, MSI-USA, NB, PB, PBD, PBEX, PBI, PBIS, PBMS, PTEPS, PTF, PTSS, SBA, SBC-IA, SBC-OPS, SBCI, SBCI-MSI, SBCTRI, SBIS, SBLD, SBMS, SBMS-CC, SBMS-WLP, SBT, SBVS, SBYP, SMSI, SWBAG, SWBT, SWBW, WDPS
Bargained-for Employees of: SBC-OPS, SBYP, SMSI, SWBT

**COMPANY EXCEPTIONS (continued)**

## SBC COMPANIES/GROUPS OF EMPLOYEES FOR WHOM TERM EMPLOYEES ARE NOT ELIGIBLE FOR SHORT-TERM DISABILITY

| COMPANY | |
|---|---|
| SBC Asset Management, Inc. (NB) | until July 1, 1999 |
| SBC International, Inc. (NB) | until July 1, 1999 |
| SBC International – Management Services, Inc. (NB) | until July 1, 1999 |
| SBC Management Services, Inc. (NB) | until July 1, 1999 |
| SBC Management Services U.S.A., Inc. (NB) | until July 1, 1999 |
| SBC Operations, Inc. (B) | |
| SBC Operations, Inc. (NB) | until July 1, 1999 |
| Southwestern Bell Advertising L.P. (NB) | until July 1, 1999 |
| Southwestern Bell Messaging Services, Inc. (B) | |
| Southwestern Bell Messaging Services, Inc. (NB) | until July 1, 1999 |
| Southwestern Bell Internet Services, Inc. (NB) | until July 1, 1999 |
| Southwestern Bell Technology Resources, Inc. (NB) | until July 1, 1999 |
| Southwestern Bell Telecommunications, Inc. (NB) | until July 1, 1999 |
| Southwestern Bell Telephone Company (B) | |
| Southwestern Bell Telephone Company (NB) | until July 1, 1999 |
| Southwestern Bell Video Services, Inc. (NB) | until July 1, 1999 |
| Southwestern Bell Yellow Pages, Inc. (B) | |
| Southwestern Bell Yellow Pages, Inc. (NB) | until July 1, 1999 |

## SBC COMPANIES/GROUPS OF EMPLOYEES FOR WHOM TERM AND TEMPORARY EMPLOYEES ARE ELIGIBLE FOR LONG-TERM DISABILITY

| COMPANY | |
|---|---|
| SBC Asset Management, Inc. (NB) | until July 1, 1999 |
| SBC International, Inc. (NB) | until July 1, 1999 |
| SBC International – Management Services, Inc. (NB) | until July 1, 1999 |
| SBC Management Services, Inc. (NB) | until July 1, 1999 |
| SBC Management Services U.S.A., Inc. (NB) | until July 1, 1999 |
| SBC Operations, Inc. (B) | |
| SBC Operations, Inc. (NB) | until July 1, 1999 |
| Southwestern Bell Advertising L.P. (NB) | until July 1, 1999 |
| Southwestern Bell Messaging Services, Inc. (B) | |
| Southwestern Bell Messaging Services, Inc. (NB) | until July 1, 1999 |
| Southwestern Bell Internet Services, Inc. (NB) | until July 1, 1999 |
| Southwestern Bell Technology Resources, Inc. (NB) | until July 1, 1999 |
| Southwestern Bell Telecommunications, Inc. (NB) | until July 1, 1999 |
| Southwestern Bell Telephone Company (B) | |
| Southwestern Bell Telephone Company (NB) | until July 1, 1999 |
| Southwestern Bell Video Services, Inc. (NB) | until July 1, 1999 |
| Southwestern Bell Yellow Pages, Inc. (B) | |
| Southwestern Bell Yellow Pages, Inc. (NB) | until July 1, 1999 |

NB = Nonbargained employees
B = Bargained-for employees

Nonbargained Employees of: AMI, DGA, IIC, MSI, MSI-USA, NB, PB, PBD, PBEX, PBI, PBIS, PBMS, PTEPS, PTF, PTSS, SBA, SBC-IA, SBC-OPS, SBCI, SBCI-MSI, SBCTRI, SBIS, SBLD, SBMS, SBMS-CC, SBMS-WLP, SBT, SBVS, SBYP, SMSI, SWBAG, SWBT, SWBW, WDPS
Bargained-for Employees of: SBC-OPS, SBYP, SMSI, SWBT

Date Issued: 3/99

**COMPANY EXCEPTIONS (continued)**

## SBC COMPANIES/GROUPS OF EMPLOYEES HAVING SHORT- AND LONG-TERM BENEFITS EQUAL TO 50% OF PAY

| COMPANY |
|---|
| SBC Operations, Inc. (B) |
| Southwestern Bell Messaging Services, Inc. (B) |
| Southwestern Bell Telephone Company (B) |
| Southwestern Bell Yellow Pages, Inc. (B) |

## SBC COMPANIES/GROUPS OF EMPLOYEES FOR WHOM TOTAL DAY ABSENCES ARE REQUIRED TO BE ELIGIBLE FOR SHORT-TERM DISABILITY BENEFITS

| COMPANY | |
|---|---|
| Southwestern Bell Advertising L.P. (NB) | until July 1, 1999* |
| Southwestern Bell Yellow Pages (NB) | until July 1, 1999* |
| Southwestern Bell Yellow Pages (B) | |

*After this date, total and partial days will count towards waiting period prior to receiving benefits.

## SBC COMPANIES/GROUPS OF EMPLOYEES FOR WHOM AMOUNTS RECEIVED FROM THIRD PARTY LAWSUITS ARE NOT OFFSET

| COMPANY | |
|---|---|
| SBC Asset Management, Inc. (NB) | until July 1, 1999 |
| SBC International, Inc. (NB) | until July 1, 1999 |
| SBC International – Management Services, Inc. (NB) | until July 1, 1999 |
| SBC Management Services, Inc. (NB) | until July 1, 1999 |
| SBC Management Services U.S.A., Inc. (NB) | until July 1, 1999 |
| SBC Operations, Inc. (B) | |
| SBC Operations, Inc. (NB) | until July 1, 1999 |
| Southwestern Bell Advertising L.P. (NB) | until July 1, 1999 |
| Southwestern Bell Messaging Services, Inc. (B) | |
| Southwestern Bell Messaging Services, Inc. (NB) | until July 1, 1999 |
| Southwestern Bell Internet Services, Inc. (NB) | until July 1, 1999 |
| Southwestern Bell Technology Resources, Inc. (NB) | until July 1, 1999 |
| Southwestern Bell Telecommunications, Inc. (NB) | until July 1, 1999 |
| Southwestern Bell Telephone Company (B) | |
| Southwestern Bell Telephone Company (NB) | until July 1, 1999 |
| Southwestern Bell Video Services, Inc. (NB) | until July 1, 1999 |
| Southwestern Bell Yellow Pages, Inc. (B) | |
| Southwestern Bell Yellow Pages, Inc. (NB) | until July 1, 1999 |

NB = Nonbargained employees
B = Bargained-for employees

Nonbargained Employees of: AMI, DGA, IIC, MSI, MSI-USA, NB, PB, PBD, PBEX, PBI, PBIS, PBMS, PTEPS, PTF, PTSS, SBA, SBC-IA, SBC-OPS, SBCI, SBCI-MSI, SBCTRI, SBIS, SBLD, SBMS, SBMS-CC, SBMS-WLP, SBT, SBVS, SBYP, SMSI, SWBAG, SWBT, SWBW, WDPS
Bargained-for Employees of: SBC-OPS, SBYP, SMSI, SWBT

DI 16

Date Issued: 3/99

49

**COMPANY EXCEPTIONS (continued)**

## SBC COMPANIES/GROUPS OF EMPLOYEES FOR WHOM THE 13-WEEK RELAPSE RULE (RETURNING TO WORK BUT THEN BECOMING DISABLED AGAIN) IS RETAINED*

| COMPANY | |
|---|---|
| SBC Asset Management, Inc. (NB) | until July 1, 1999 |
| SBC International, Inc. (NB) | until July 1, 1999 |
| SBC International – Management Services, Inc. (NB) | until July 1, 1999 |
| SBC Management Services, Inc. (NB) | until July 1, 1999 |
| SBC Management Services U.S.A., Inc. (NB) | until July 1, 1999 |
| SBC Operations, Inc. (B) | |
| SBC Operations, Inc. (NB) | until July 1, 1999 |
| Southwestern Bell Advertising L.P. (NB) | until July 1, 1999 |
| Southwestern Bell Messaging Services, Inc. (B) | |
| Southwestern Bell Messaging Services, Inc. (NB) | until July 1, 1999 |
| Southwestern Bell Internet Services, Inc. (NB) | until July 1, 1999 |
| Southwestern Bell Technology Resources, Inc. (NB) | until July 1, 1999 |
| Southwestern Bell Telecommunications, Inc. (NB) | until July 1, 1999 |
| Southwestern Bell Telephone Company (B) | |
| Southwestern Bell Telephone Company (NB) | until July 1, 1999 |
| Southwestern Bell Video Services, Inc. (NB) | until July 1, 1999 |
| Southwestern Bell Yellow Pages, Inc. (B) | |
| Southwestern Bell Yellow Pages, Inc. (NB) | until July 1, 1999 |

* This means that if the employee recovers from STD and returns to work for 13 full weeks or more and becomes disabled again, STD will commence on the eighth consecutive day of a new absence and any benefits previously received are not counted in determining the new full or partial pay periods of benefits or in determining the maximum period an employee can receive STD benefits.

NB = Nonbargained employees
B = Bargained-for employees

Nonbargained Employees of: AMI, DGA, HC, MSI, MSI-USA, NB, PB, PBD, PBEX, PBI, PBIS, PBMS, PTEPS, PTF, PTSS, SBA, SBC-IA, SBC-OPS, SBCI, SBCI-MSI, SBCTRI, SBIS, SBLD, SBMS, SBMS-CC, SBMS-WLP, SBT, SBVS, SBYP, SMSI, SWBAG, SWBT, SWBW, WDPS
Bargained-for Employees of: SBC-OPS, SBYP, SMSI, SWBT

**COMPANY EXCEPTIONS (continued)**

## SBC COMPANIES/GROUPS OF EMPLOYEES FOR WHOM THE FOLLOWING DIFFERENT SCHEDULE FOR MAXIMUM PERIOD OF DISABILITY PAYMENTS APPLIES

| Your Age When STD Benefits Begin | Maximum Period of Disability Payments* |
|---|---|
| 62 | 3 ½ years |
| 63 | 3 years |
| 64 | 2 ½ years |
| 65 | 2 years |
| 66 | 1 ¾ years |
| 67 | 1 ½ years |
| 68 | 1 ¼ years |
| 69 or older | 1 year |

** includes a 52-week period of STD benefits*

| COMPANY | |
|---|---|
| SBC Asset Management, Inc. (NB) | until July 1, 1999 |
| SBC International, Inc. (NB) | until July 1, 1999 |
| SBC International – Management Services, Inc. (NB) | until July 1, 1999 |
| SBC Management Services, Inc. (NB) | until July 1, 1999 |
| SBC Management Services U.S.A., Inc. (NB) | until July 1, 1999 |
| SBC Operations, Inc. (B) | |
| SBC Operations, Inc. (NB) | until July 1, 1999 |
| Southwestern Bell Advertising L.P. (NB) | until July 1, 1999 |
| Southwestern Bell Messaging Services, Inc. (B) | |
| Southwestern Bell Messaging Services, Inc. (NB) | until July 1, 1999 |
| Southwestern Bell Internet Services, Inc. (NB) | until July 1, 1999 |
| Southwestern Bell Technology Resources, Inc. (NB) | until July 1, 1999 |
| Southwestern Bell Telecommunications, Inc. (NB) | until July 1, 1999 |
| Southwestern Bell Telephone Company (B) | |
| Southwestern Bell Telephone Company (NB) | until July 1, 1999 |
| Southwestern Bell Video Services, Inc. (NB) | until July 1, 1999 |
| Southwestern Bell Yellow Pages, Inc. (B) | |
| Southwestern Bell Yellow Pages, Inc. (NB) | until July 1, 1999 |

NB = Nonbargained employees
B = Bargained-for employees

Nonbargained Employees of: AMI, DGA, HC, MSI, MSI-USA, NB, PB, PBD, PBEX, PBI, PBIS, PBMS, PTEPS, PTF, PTSS, SBA, SBC-IA, SBC-OPS, SBCI, SBCI-MSI, SBCTRI, SBIS, SBLD, SBMS, SBMS-CC, SBMS-WLP, SBT, SBVS, SBYP, SMSI, SWBAG, SWBT, SWBW, WDPS
Bargained-for Employees of: SBC-OPS, SBYP, SMSI, SWBT

DI 18

Date Issued: 3/99

**COMPANY EXCEPTIONS (continued)**

### SBC COMPANIES/GROUPS OF EMPLOYEES FOR WHOM A FAMILY SOCIAL SECURITY OFFSET IS APPLICABLE

| COMPANY | |
|---|---|
| SBC Asset Management, Inc. (NB) | until July 1, 1999 |
| SBC International, Inc. (NB) | until July 1, 1999 |
| SBC International – Management Services, Inc. (NB) | until July 1, 1999 |
| SBC Management Services, Inc. (NB) | until July 1, 1999 |
| SBC Management Services U.S.A., Inc. (NB) | until July 1, 1999 |
| SBC Operations, Inc. (B) | |
| SBC Operations, Inc. (NB) | until July 1, 1999 |
| Southwestern Bell Advertising L.P. (NB) | until July 1, 1999 |
| Southwestern Bell Messaging Services, Inc. (NB) | until July 1, 1999 |
| Southwestern Bell Internet Services, Inc. (NB) | until July 1, 1999 |
| Southwestern Bell Technology Resources, Inc. (NB) | until July 1, 1999 |
| Southwestern Bell Telecommunications, Inc. (NB) | until July 1, 1999 |
| Southwestern Bell Telephone Company (NB) | until July 1, 1999 |
| Southwestern Bell Video Services, Inc. (NB) | until July 1, 1999 |
| Southwestern Bell Yellow Pages, Inc. (NB) | until July 1, 1999 |

### SBC COMPANIES/GROUPS OF EMPLOYEES FOR WHOM VOCATIONAL REHABILITATION IS VOLUNTARY

| COMPANY | |
|---|---|
| SBC Asset Management, Inc. (NB) | until July 1, 1999 |
| SBC International, Inc. (NB) | until July 1, 1999 |
| SBC International – Management Services, Inc. (NB) | until July 1, 1999 |
| SBC Management Services, Inc. (NB) | until July 1, 1999 |
| SBC Management Services U.S.A., Inc. (NB) | until July 1, 1999 |
| SBC Operations, Inc. (B) | |
| SBC Operations, Inc. (NB) | until July 1, 1999 |
| Southwestern Bell Advertising L.P. (NB) | until July 1, 1999 |
| Southwestern Bell Messaging Services, Inc. (B) | |
| Southwestern Bell Messaging Services, Inc. (NB) | until July 1, 1999 |
| Southwestern Bell Internet Services, Inc. (NB) | until July 1, 1999 |
| Southwestern Bell Technology Resources, Inc. (NB) | until July 1, 1999 |
| Southwestern Bell Telecommunications, Inc. (NB) | until July 1, 1999 |
| Southwestern Bell Telephone Company (B) | |
| Southwestern Bell Telephone Company (NB) | until July 1, 1999 |
| Southwestern Bell Video Services, Inc. (NB) | until July 1, 1999 |
| Southwestern Bell Yellow Pages, Inc. (B) | |
| Southwestern Bell Yellow Pages, Inc. (NB) | until July 1, 1999 |

NB = Nonbargained employees
B = Bargained-for employees

Nonbargained Employees of: AMI, DGA, HC, MSI, MSI-USA, NB, PB, PBD, PBEX, PBI, PBIS, PBMS, PTEPS, PTF, PTSS, SBA, SBC-IA, SBC-OPS, SBCI, SBCI-MSI, SBCTRI, SBIS, SBLD, SBMS, SBMS-CC, SBMS-WLP, SBT, SBVS, SBYP, SMSI, SWBAG, SWBT, SWBW, WDPS
Bargained-for Employees of: SBC-OPS, SBYP, SMSI, SWBT

Date Issued: 3/99

**COMPANY EXCEPTIONS (continued)**

## CLAIMS ADMINISTRATION

Unless noted below, SBC companies/groups of employees have the **Disability Absence Resource Team (DART)** as their Claims Administrator responsible for STD eligibility determination and **Core Inc.** as their Claims Administrator for determining disability from a medical standpoint for both STD and LTD purposes and eligibility for LTD. You should follow the procedures outlined within this summary plan description to file claims, receive benefits or appeal a denied claim.

The following SBC companies/groups of employees have the **Disability Assistance Program (DAP)** as their STD Claims Administrator for eligibility determination and for determining disability from a medical standpoint for all STD claims and initial LTD claims. **Aetna Life Insurance Company** is their LTD Claims Administrator for eligibility determination and for determining disability from a medical standpoint after the initial LTD determination.

**Nevada Bell (NB)**
**PBD Holdings (doing business as Digital Graphics ADvantage) (NB)**
**Pacific Bell (NB)**
**Pacific Bell Directory (NB)**
**Pacific Bell Electronic Publishing Services (NB)**
**Pacific Bell Extras (NB)**
**Pacific Bell Information Services (NB)**
**Pacific Bell Internet Services (NB)**
**Pacific Bell Mobile Services (NB)**
**Pacific Telesis Group (NB)**
**Pacific Telesis Shared Services (NB)**
**PacTel Finance (NB)**
**SBC Interactive (NB)**

The SBC companies/groups of employees listed above should follow the procedures outlined within this summary plan description except:

- The employee's supervisor reports the claim to DAP; and
- The employee must submit an application to request Long-Term Disability Benefits.

The following SBC companies/groups of employees have Aetna Life Insurance Company as their Claims Administrator for determining eligibility and disability from a medical standpoint for both STD and LTD claims:

**Southwestern Bell Communications Services, Inc.**

NB = Nonbargained employees
B = Bargained-for employees

**Nonbargained Employees of:** AMI, DGA, IIC, MSI, MSI-USA, NB, PB, PBD, PBEX, PBI, PBIS, PBMS, PTEPS, PTF, PTSS, SBA, SBC-IA, SBC-OPS, SBCI, SBCI-MSI, SBCTRI, SBIS, SBLD, SBMS, SBMS-CC, SBMS-WLP, SBT, SBVS, SBYP, SMSI, SWBAG, SWBT, SWBW, WDPS
**Bargained-for Employees of:** SBC-OPS, SBYP, SMSI, SWBT

# Process for Reporting a Request for Temporary or Permanent Work Restrictions or Accommodation

**(Employee is losing workdays and has called in a disability claim)**

The employee and/or the health care provider would make the request known to the assigned case manager. If the employee contacts the Department or HR directly requesting an accommodation in order to return to work, the employee should be referred to his or her case manager at SMAART.

The case manager will obtain additional medical information as necessary. The case manager may consult with the Return to Work Specialist (RTWS) or Physician Consultant within the Disability Center.

If the medical information supports the requested work restriction or accommodation, the case manager will contact the employee's supervisor to determine if the department can provide the work restriction or accommodation. The department should consult with HR and the Legal Department when making its decision.

When the department is unable to reasonably provide what has been identified as a **temporary** restriction or accommodation, the case manager will refer the file to the Disability Center's Return to Work Specialist for review.

When **permanent** restrictions or accommodations have been identified and the department has informed the Disability Center that it is unable to reasonably provide the restrictions or accommodations, the Return to Work Specialist will contact the Associate Director of Job Accommodations for assistance.

**EXHIBIT  B**

**AT&T Integrated Disability Service Center**
*As Administered by Sedgwick CMS*
P.O. Box 61569; King of Prussia, PA; 19406; Telephone 866-276-2278; Facsimile 866-224-4627

Date Recv: 11/16/2006

November 16, 2006

Mr. Louis J. Vela
1753 - 41st Street
Sacramento, CA 95819

Re: AT&T Disability Income Plan (DIP)
Long Term Disability Claim #: A325022709-0001-01

Dear Mr. Vela:

Please be advised that after a careful and thorough review of your request for payment of long term disability (LTD) benefits, it has been determined that your claim does not qualify for payment under the AT&T Disability Income Plan (DIP). As a result, benefits are denied effective November 1, 2006.

Section 2.1 of the DIP defines "long term disability" as follows in relevant part:

> "* * * * 'Total Disability or 'Totally Disabled' means, with regard to Long Term Disability, that because of Illness or Injury, an Employee is prevented from engaging in any employment for which the Employee is qualified or may reasonably become qualified based on education, training or experience. An Employee is considered Totally Disabled if he is incapable of performing the requirements of a job other than one for which the rate of pay is less than 50% of his Basic Wage Rate at the time his Long Term Disability started. However, the Employee is allowed to work and still receive Long Term Disability Benefits if the job pays less than 50% of his Basic Wage Rate before his Disability started. The Benefits payable, when added to the pay the Employee receives for working, cannot exceed 75% of his Basic Wage Rate at the time his Long Term Disability started."

On September 22, 2006, Mrs. Vela contacted our office to inform that you had recently begun working in the Plumbing Department at the Tower Inn Home Depot store. On October 4, 2006, we reviewed with Mrs. Vela the above-referenced provision as it pertains to working and receiving long term disability benefits. She was informed that earning in excess of $1,144.76 per month would result in the termination of benefits.

The paycheck stubs we subsequently received for hours worked between August 28, 2006 and October 8, 2006, showed you are earning $11.50 per hour. Review of these records showed that hours worked for the month of September provided you with earnings substantially in excess of $1,144.76. Your LTD benefit, when combined with your September earnings, exceeded 75% of your basic wage rate of $7,631.75 at the time LTD benefits started; therefore you are no longer eligible for benefits under the Disability Income Plan.

In addition, the updated medical information received from Dr. Bruce Wenokur and Dr. Martin Rogers was reviewed by a Physician Advisor specializing in Psychiatry. The Physician Advisor observed that these records did not provide any observable evidence demonstrating limitation of functioning. There is insufficient medical evidence to objectively support a global impairment precluding your ability to function in the workplace, or the ongoing need for restrictions of work hours. This would be evident in that you have been working in excess of 20 hours since the date of your initial employment, and yet you continue sustaining full-time employment.

Therefore, in addition to your earnings and LTD benefit exceeding 75% of your basic wage rate, the medical information in file does not objectively support functional restrictions precluding your ability to perform the duties of any occupation.

If you disagree with our determination, you or your authorized representative may appeal the determination by submitting a written appeal within 180 days after you receive this denial notice. Enclosed is a copy of the appeal procedure and the appeal form. In your appeal, please state the reason(s) you believe your claim should not be denied. You may also submit additional medical or vocational information, and any facts, data, questions or comments you deem appropriate for us to give your appeal proper consideration. Your appeal and supporting documentation should be submitted to:

AT&T IDSC Quality Review Unit
P.O. Box 61568
King Of Prussia, PA 19406
Fax: 1-866-856-5065

You shall be provided, upon written request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to your claim for benefits.

"Please note that your file may be supplemented after we respond to your request for relevant documents and such further information will be provided to you upon your future request(s)."

You have a right to bring a lawsuit against the DIP under Section 502(a) of the Employee Retirement Income Security Act of 1974 (ERISA) for denied benefits you believe are due to you, but only after you complete the appeal process as enumerated in the enclosed appeal procedures and in the DIP's claim procedures, and your appeal has been denied.

Questions regarding your appeal may be referred to the AT&T Integrated Disability Service Center (IDSC) Quality Review Unit at 1-866-276-2278.

If you have any questions regarding your health coverage, please contact AT&T Health Benefits Enrollment Center at 1-877-722-0020.

If you have any questions regarding your claim, please contact me at 1-866-276-2278.

Sincerely,

Nayra Rosenston
LTD Case Manager
AT&T Integrated Disability Service Center (IDSC)

cc: File

**EXHIBIT C**

February 20, 2007

ATT IDSC Quality Review Unit
P.O. Box 61568
King of Prussia, PA 19406

SUBJECT: Appeal – Claim #A225020313-01
Louis J. Vela SSN# 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

Dear Quality Review Unit:

The purpose of this letter is to appeal the AT&T's Disabilty Service Center's decision to deny an extension of my long-term disability benefits. Based on the following information and medical information submitted by Dr. Bruce Wenokur (*see attached*), I am requesting that you reconsider my eligibility for continuation of benefits.

As you know, I was diagnosed with Bipolar disorder, major depression and ADHD. I was placed on long-term disability in March 2004 after attempting to return to work at SBC (now AT&T) At that point, I had exhausted my short-term disability claim that was approved on July 15, 2002. As much as I wanted to return to work at AT&T (then SBC), I was determined to be medically unfit to return to work by SBC and only then subsequently was determined to qualify for long-term disability benefits as a direct result.

In September of 2006, I was starting to feel better (at least temporarily) and wanted to test myself in a working environment. I decided to go to work for Home Depot earning $11.00 per hour. My wife followed the required procedure and contacted Nayra Rosenston, case worker, regarding my employment. We were aware of the fact that I was allowed to earn 25% of my basic pay rate per month. My wife verified this information with Ms. Rosenston on September 11, 2006, and asked what would happen if I exceeded that amount while working at Home Depot. Ms. Rosenston informed my wife that if I <u>continued</u> to exceed the allowed amount, they would look at it on a case-by-case basis. And, she stated further that it was possible that they would deduct the exceeded amount from my monthly benefit. She told my wife she was going to look into the policy and let us know. She requested that my check stubs be faxed to her for review. We were very timely in sending the copies of the check stubs and medical information when requested and my wife was diligent about following up with my doctor's to ensure they complied with your requests as well.

My start date at Home Depot was September 5, 2006, not August 28, 2006 as stated in the denial letter. My first paycheck was $437.00 (gross pay) dated September 15. The next paycheck was $842.38 dated September 29, 2007. The total a gross amount for September was $1,279.30. This monthly amount only exceeds the allowed amount by less than $100. This is not a gainful wage considering what I was making when I was placed on long-term disability by your agency. The next paycheck which was faxed to Nayra was $937.25 on October 13, 2006. Nayra made the determination to terminate my benefits immediately after we faxed her this paycheck stub. I am assuming she considered September 15 through October 13 as one working month. However, that determination is inconsistent with what she told my wife on the telephone; she

stated that I was allowed to earn $1,170 per calendar month. First of all, the month was only half over and secondly, there was not a continuous pattern of exceeding the allowed amount.

In 2004, I had a conversation with my previous case worker, Maggie Neihland (previously with SMAART), which you should have of record of. She informed me of the rules regarding working while on long-term disability and said that if I choose to work and exceeded the allowed amount, that excess amount would be deducted from my monthly benefit check.

Ms. Rosenston mislead my wife when she stated "if he continues to exceed that amount, we will look at his case" and stated that she couldn't find any information on the policy regarding what constitutes "continue to exceed". **The decision to terminate my benefits was obviously made prior to any continuation of exceeding the 25%.**

This detailed information about the check stubs is actually irrelevant. My condition hasn't changed and I am still not capable of going back to work earning 60% of my capacity. Even if that was the case, I don't think we can make that determination after only 5 weeks of being back to work. As stated in my doctor's notes in September and October, it was recommended that I limit my hours not to exceed 20 per week. I am no longer working at Home Depot. I still continue to have severe anxiety and depression and cannot function in the workplace on a full time basis. If my doctors' felt I was well enough to work at my full capacity, I would be doing so.

I continue to see psychologist Dr. Martin Rodgers on a bimonthly basis. My last appointment with him was on February 8, 2007. My next appointment with him is on March 1, 2007. I also continue to see Dr. Bruce Wenokur on a monthly basis. He is still making adjustments to my medications. I am still having a hard time with sleep patterns, obsessiveness, depression and anxiety. My current medications are as follows:

| | |
|---|---|
| 7:00 a.m. | 300 mg Effexor XR |
| 10:00 p.m. | 3 mg Xanax XR |
| | 3 mg Lunesta |
| | 300 mg Lamictal |
| | .75 mg Risperdal |

The reasons I qualified for long-term disability still stand. Please consider overturning this denial as soon as possible so I can continue to receive long-term disability benefits until I am able to work at my full capacity. Thank you for your time and consideration.

Sincerely,

Louis Joseph Vela

Enclosures: Letter from Dr. Bruce Wenokur

Cc: Michael White, Attorney at Law

**EXHIBIT  D**

**AT&T Integrated Disability Service Center**
**Quality Review Unit**
*As Administered by Sedgwick CMS*

P.O. Box 14626; Lexington, KY 40512; Telephone 866-276-2278; Facsimile 866-856-5065

April 12, 2007

LOUIS VELA
1753 41ST STREET
SACRAMENTO, CA 95819

Re: AT&T Disability Income Plan (DIP)
Claim Number: A325022709-0001-01

Dear Mr. Vela:

Your claim appealing the denial of long term disability benefits under the AT&T Disability Income Plan (DIP) was reviewed by the AT&T Integrated Disability Service Center (IDSC) Quality Review Unit.

The AT&T Integrated Disability Service Center (IDSC) Quality Review Unit reviewed all submitted material and information regarding the denial of long term disability benefits by the AT&T Integrated Disability Service Center for your claim with a first date absent of July 6, 2002. After this review, the Unit determined to uphold the denial of benefits based on the following provisions in Section 2.1:

" 'Total Disability' or 'Totally Disabled' means, with regard to Long Term Disability, that because of Illness or Injury, an Employee is prevented from engaging in any employment for which the Employee is qualified or may reasonably become qualified based on education, training, or experience. An Employee is considered Totally Disabled if he is incapable of performing the requirements of a job other than one for which the rate of pay is less than 50% of his Basic Wage Rate at the time his Long Term Disability started. However, the Employee is allowed to work and still receive Long Term Disability Benefits if the job pays less than 50% of his Basic Wage Rate before his Disability started. The Benefits payable, when added to the pay the Employee receives for working, cannot exceed 75% of his Basic Wage Rate at the time his Long Term Disability started."

The Unit and the independent physician advisor reviewed all of the medical information, which included medical information from Bruce Wenokur, MD; Surendar Chima, MD; Martin Rogers, PhD; Rob Woodman, PhD; and Heritage Oaks Hospital dated June 23, 2003 through March 5, 2007.

The medical information indicated that you received treatment for major depressive disorder, bipolar disorder, amphetamine abuse, impulse control disorder, attention deficit disorder, cocaine abuse, cannabis abuse and passive-aggressive personality features.

After review of the medical information by the Unit and the independent physician advisor the decision was made to uphold the denial for the appealed period.

The independent physician advisor, Robert Polsky, MD, a psychiatrist, attempted to complete a teleconference with Dr. Wenokur but his attempts were unsuccessful.  Therefore, he reviewed the information that was provided and indicated that during the timeframe in question you are not documented to be suicidal, parasuicidal, homicidal, manic, psychotic, or impaired in performing activities of daily living.  He observed that absent are findings of mental status examinations that would indicate problems with memory, cognition or concentration.  He stated that the determination of his review is that the available clinical documentation does not indicate that you are disabled from performing any job from November 1, 2006 to the present.

Furthermore, the paycheck stubs you submitted for the period of August 28, 2006 through October 8, 2006 indicated that you earned for the month of September in excess of $1,144.76.  Therefore, you are no longer eligible for benefits under the Disability Income plan as your LTD benefit when combined with your September earnings exceeded 75% of your basic wage rage, when LTD benefits started, of $7,631.75.

Although some findings are referenced, none are documented to be so severe as to prevent you from performing the duties of any occupation as of November 1, 2006.

Under the terms of the AT&T Disability Income Plan the decision of the Unit is final.  If you have questions you may contact us at 1-866-276-2278.

You shall be provided, upon written request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to your claim benefits.

You have the right to bring suit under Section 502(a) of the Employee Retirement Income Security Act of 1974 after there has been full exhaustion of your appeal rights as enumerated in your plan's claim procedures and those rights have been exercised and the Plan benefit's requested by said claimant in such appeal have been denied in whole or in part by your employer.

Sincerely,


Angela DeBolt
Appeal Specialist
AT&T Integrated Disability Service Center (IDSC) Quality Review Unit